The OWENSBORO NATIONAL BANK, et al., Plaintiffs,

and

United States of America, Intervening Plaintiff,

v.

Ronnie C. MOORE, Commissioner, Defendant,

and

Kentucky State Association of Life Underwriters, et al., Intervening Defendants.

Civ. A. No. 91–3.

United States District Court, E.D. Kentucky, at Frankfort.

Aug. 4, 1992.

26

M. Brooks Senn, Senn, Miller & Smith, Louisville, Ky., for plaintiffs.

U.S. Atty., Lexington, Ky., Anne L. Weismann, Paul W. Bridenhagen, Dept. of Justice, Rosa M. Koppel, Sr. Attorney, Litigation Div., Office of Comptroller of Currency, Washington, D.C., for intervening plaintiff.

John T. McGarvey, Morgan & Pottinger, Louisville, Ky., for amicus curiae American Bankers Ass'n.

Stephen B. Cox, Asst. Gen. Counsel, Kentucky Dept. of Ins., Frankfort, Ky., for defendant.

Terrell L. Black, Larry R. Blanton, Black, Carle, Maze & Wilmes, Louisville, Ky., Jonathan B. Sallet, Ann M. Kappler, Jenner & Block, Washington, D.C., for intervening defendants.

## MEMORANDUM OPINION AND ORDER

HOOD, District Judge.

This matter is before the court upon several pending motions. The defendant, Ronnie C. Moore, the Commissioner of the Kentucky Department of Insurance (the Commissioner), has moved to dismiss the complaint. [Record # 4]. The intervening defendants (collectively referred to as "the associations") have also filed a motion to dismiss. [Record # 7]. The plaintiffs have moved for summary judgment, [Record # 14], as have the Commissioner and the associations. [Record # 28]. Finally, the United States has moved for summary judgment on its intervening complaint. [Record # 60]. These motions have been fully briefed and argued to the court, and this matter is ready for consideration.

## I. FACTUAL BACKGROUND

The underlying facts of this case are undisputed. The plaintiff banks are national banking associations organized under the laws of the United States. Two of the plaintiffs, The First National Bank of Louisa, and Citizens National Bank of Paintsville are located in Kentucky towns with less than 5,000 inhabitants, as shown by the 1990 Decennial Census. The other banking plaintiff, The Owensboro National Bank, maintains a branch in Whitesville, Kentucky, which also has a 1990 population of less than 5,000 persons. Each plaintiff bank is owned by a bank holding company.

In the fall of 1990, the plaintiff banks communicated to the Commissioner their wish to apply for licenses to act as general lines and life insurance agents. Responding by letter dated January 10, 1991, the Commissioner declined to immediately provide the requested applications, stating that "such a dramatic change in our longstanding interpretation of both statutory and case law should not be lightly granted." Letter from Commissioner Elizabeth Wright to M. Brooks Senn (January 10, 1991) [Record # 16, Tab 6]. Rather, the Commissioner scheduled a public hearing for February 13, 1991, to determine "whether or not the Kentucky Department of Insurance shall issue the insurance agents licenses requested ... upon completion of the applicable licensing procedures as set forth in KRS 304, Subtitle 9 ....". [Record # 30, Tab 2].

On January 24, 1991, the plaintiffs filed the present action in this court seeking a declaration of rights and injunctive relief. [Record # 1]. Specifically, the plaintiffs asked this court to require the Commissioner's compliance with 12 U.S.C. § 92, which purportedly permits national banks having an office in towns with less than 5,000 inhabitants to act as insurance agents.

The day prior to filing suit, one of the plaintiffs, the Kentucky Bankers Association (the KBA), apparently distributed a memorandum to its members stating that the Commissioner's hearing "could prove to be a circus", and may be "nothing more than a 'name-calling' session." Memorandum from Ballard W. Cassidy, Jr. to KBA Members (January 23, 1991) [Record # 5, Exhibit C]. The KBA urged its members not to attend the hearing. Nevertheless, the plaintiffs did attend, but called no witnesses. Rather, they submitted written objections to the hearing itself, and restated their legal arguments.

No resolution was attained at the hearing, and the hearing officer permitted the Commissioner to engage in limited discovery, over plaintiffs' objections. [Record # 11, Tabs 5 & 6]. The hearing was recessed until April 8, 1991, and at that time additional evidence was presented by the Commissioner. No final action ever resulted from the hearing, and further proceedings in the Department of Insurance were eventually stayed, pending the outcome of this litigation, by order of the Franklin Circuit Court. [Record # 24, Exhibit 1].

This matter has been submitted to this court on cross-motions for summary judgment, and the parties have presented arguments on those motions. However, the Commissioner and the associations have asserted that this court does not have subject matter jurisdiction over this action. That assertion must be addressed prior to any

consideration of the motions for summary judgment.

## II. JUSTICIABILITY

The Commissioner and the associations raise several arguments in support of their contention that this court lacks subject matter jurisdiction. They contend that this matter is not ripe for decision as no final action has been taken by the Commissioner. They further assert that the plaintiffs have not exhausted their state remedies. Finally, they argue that this court should abstain from adjudicating this action because to do so would interfere with ongoing state proceedings, and because the plaintiffs' claims raise unsettled questions of state law.

### A. RIPENESS

■ This court is limited to the adjudication of actual cases or controversies. U.S. Const. art. III, § 2. For this court to exercise jurisdiction over this case, it must be ripe for decision. The doctrine of ripeness "dictates that the courts should decide only existing, substantial controversies, not hypothetical questions or possibilities." *City Communications, Inc., v. City of Detroit*, 888 F.2d 1081, 1089 (6th Cir.1989). In the context of administrative action, this doctrine prevents courts from becoming involved in disagreements over administrative policies and protects agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).

■ Here, the Commissioner and the associations argue that because the Department of Insurance was not permitted to complete its administrative process before this suit was filed, the dispute is not ripe for decision. It is true that this action was filed on January 24, 1991, after the plaintiffs received notice of the public hearing on their request for applications, but before the hearing was held. However, as will be seen in detail later, the Commonwealth of Kentucky, acting through its At-torney General and/or the Commissioner, has long taken the position that the plaintiff banks are not authorized to act as insurance agents in Kentucky.

In addressing the issue of ripeness, the court is persuaded by the reasoning of the Supreme Court in *Columbia Broadcasting System v. United States*, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942). In *CBS*, the Federal Communications Commission had issued a regulation which would have prevented the issuance of radio licenses to stations which signed network affiliation contracts with certain provisions. Although no license had been revoked and the FCC had not refused to grant any license based upon the regulation, the Court held that a challenge to the regulation was ripe. The court specifically noted that the FCC action was no less reviewable because promulgation of the regulation itself did not deny or cancel a license. It was enough that failure to comply with the regulation would penalize the licensees, and ultimately CBS, the contracting network. *Id*, at 417, 62 S.Ct., at 1200; *see also United States v. Storer Broadcasting Co.*, 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956).

The present situation is similar. Although the Commissioner has not taken final action with respect to the plaintiff banks' requests for applications, his long-standing view of the questions involved constitute action which is sufficiently final to concretely affect the plaintiffs interests. This view is amply supported by the aggressive stance the Commissioner has taken in this litigation in setting forth his view of both federal and state law in this area and the interaction between both spheres. Ripeness is now viewed as a matter of common sense, and the court is convinced that absolutely no purpose would be served by permitting the Commissioner to continue with his charade of evaluation before this court addresses the merits of this litigation. *See McCoy–Elkhorn Coal Corp. v. United States Environmental Protection Agency*, 622 F.2d 260, 264 (6th Cir. 1980).

This decision comports with the Supreme Court's two part ripeness test articulated in

*Abbott Laboratories.* There the Court determined that ripeness depends upon both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. *Abbott Laboratories,* 387 U.S., at 149, 87 S.Ct., at 1515. This action presents purely legal questions which are fit for judicial decision at this time. In addition, this court has no difficulty concluding that hardship to the plaintiffs would result if judicial consideration were withheld. This matter is ripe for decision by this court.

## B. EXHAUSTION

When the actions of an administrative agency are involved, exhaustion of remedies is generally required to prevent premature interference with agency processes, so that the agency may function efficiently and correct its own mistakes, to afford the parties and the court the benefit of the agency's expertise, and to compile an adequate record for judicial review. *Weinberger v. Salfi,* 422 U.S. 749, 765, 95 S.Ct. 2457, 2466, 45 L.Ed.2d 522 (1975). However, when the issue is solely one of statutory interpretation, judicial review is permitted since resolution of the issue requires no special expertise on the part of the involved agency. *McKart v. United States,* 395 U.S. 185, 198–99, 89 S.Ct. 1657, 1665–66, 23 L.Ed.2d 194 (1969).

Here, the issues before the court involve questions of law and statutory interpretation. There is no requirement that the plaintiffs exhaust their administrative remedies under these circumstances. Since the Commissioner has admitted that the plaintiffs meet the location requirements of 12 U.S.C. § 92, [Record # 11, Tab 4], any further consideration by the Commissioner would involve the same evaluation of legal issues performed by this court. The plaintiffs' failure to exhaust their state administrative remedies does not prevent this court from exercising jurisdiction over this matter. *Shawnee Coal Co. v. Andrus,* 661 F.2d 1083, 1093 (6th Cir.1981).

## C. ABSTENTION

The Commissioner and the associations point to two lines of abstention cases in support of their argument that this court should decline to exercise its jurisdiction in this matter. The court will address each line of cases separately.

### 1. *Younger* Abstention

Ordinarily, federal courts should not issue declarative or injunctive relief which would interfere with ongoing state proceedings. *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). However, the Commissioner and the associations are incorrect in arguing that *Younger* applies in the present case.

The ultimate question in this litigation is whether state law is preempted by federal law. In that circumstance, abstention is not required. *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 237, 104 S.Ct. 2321, 2327, 81 L.Ed.2d 186 (1984). This case neither requires the interpretation of state law nor the making of findings on disputed facts. The considerations which would require *Younger* abstention are not present. *Norfolk & Western Railway Co. v. Public Utilities Comm. of Ohio,* 926 F.2d 567, 573 (6th Cir.1991).

### 2. *Burford* Abstention

This court should also abstain from granting equitable relief that interferes with proceedings in state administrative agencies which involve complex state regulatory policies, such as ratemaking. *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). However, like the *Younger* doctrine, *Burford* does not prevent this court from addressing issues of federal preemption of state law. *New Orleans Public Service, Inc. v. Council of the City of New Orleans,* 491 U.S. 350, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989). This case does not implicate *Burford* abstention.

## D. THE MOTIONS TO DISMISS

The motions to dismiss of the Commissioner and the associations are without

merit for the reasons stated above. Both motions will be denied.

## III. LEGAL FRAMEWORK

Prior to evaluating the merits of the cross-motions for summary judgment, it is essential to set forth the legal framework for the discussion. Both federal and state law are involved, and the court will briefly discuss each.

### A. FEDERAL LAW

 The plaintiff banks are national banking associations organized under the laws of the United States. *See.* 12 U.S.C. § 1 *et seq.* The National Banking Act constitutes the paramount authority for the operation of national banking associations, and, by itself, constitutes a complete system for the establishment and government of national banks. *First National Bank in Plant City, Fla. v. Dickinson*, 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969); *Deitrick v. Greaney*, 309 U.S. 190, 60 S.Ct. 480, 84 L.Ed. 694 (1940). However, national banks are also subject to state laws, so long as those state laws do not conflict with or frustrate the purpose of laws of the United States. *Starr v. O'Connor*, 118 F.2d 548 (6th Cir.1941).

The National Banking Act was enacted in 1864. Act of June 3, 1864, c. 106, 13 Stat. 99. In 1913, Congress enacted the Federal Reserve Act, Act of December 23, 1913, c. 6, 38 Stat. 251, to foster a flow of credit and money, through both federal and state chartered institutions, which would facilitate orderly economic growth. *Collateral Lenders Committee v. Board of Governors of the Federal Reserve System*, 281 F.Supp. 899, 904 (S.D.N.Y.1968).

In 1916, Congress amended the Federal Reserve Act, adding, among other sections, 12 U.S.C. § 92.[1] This section was added at the request of the Comptroller of the Currency, and allowed national banks located in towns with less than 5,000 inhabitants to sell insurance under certain circumstances.[2] The Comptroller has issued a regulation which provides that this section is applicable to any branch of a national bank which is located in a town with less than 5,000 inhabitants, even though the principal office of the national bank may be in a town with a population greater than 5,000 persons. 12 C.F.R. § 7.7100 (1971). Although there is a question as to whether 12 U.S.C. § 92 was repealed in 1918, the Comptroller has continued to assume that the section remains in force. *See, e.g.,* Letter from First Deputy Comptroller for Policy Robert Bloom to Oklahoma Insurance Commissioner Gerald Grimes (November 14, 1975) [Record #11, Tab 8]; and Letter from Chief Counsel Paul Allen Schott to Louisiana Insurance Commissioner Douglas D. Green (October 30, 1990) [Record #16, Tab 27].

Presently, approximately 179 national banks in fifteen states are conducting insurance activities pursuant to 12 U.S.C. § 92. Affidavit of Rosa M. Koppel, [Rec-

1. The question of whether this section continues to exist will be addressed later in this memorandum opinion and order.

2. The full text of this section is as follows: In addition to the powers now [Sept. 7, 1916] vested by law in national banking associations organized under the laws of the United States any such association located in and doing business in any place the population of which does not exceed five thousand inhabitants, as shown by the last preceding decennial census, may, under such rules and regulations as may be prescribed by the Comptroller of the Currency, act as the agent for any fire, life, or other insurance company authorized by the authorities of the State in which said bank is located to do business in said State, by soliciting and selling insurance and collecting premiums on policies issued by such company; and may receive for services so rendered such fees between the said association and the insurance company for which it may act as agent; and may also act as the broker or agent for others in making or procuring loans on real estate located within one hundred miles of the place in which said bank may be located, receiving for such services a reasonable fee or commission: Provided, however, That no such bank shall in any case guarantee either the principal or interest of any such loans or assume or guarantee the payment of any premium on insurance policies issued through its agency by its principal: And provided further, That the bank shall not guarantee the truth of any statement made by an assured in filing his application for insurance. (Sept. 7, 1916, c. 461, 39 Stat. 753).

ord # 61, Exhibit 1]. None of these national banks are located in Kentucky. *Id.*

## B. KENTUCKY LAW

Despite the enactment of 12 U.S.C. § 92, and quite apart from any debate over its continued existence, the Commissioner contends that national banks located in Kentucky may not engage in insurance activities, except in limited circumstances. The Commissioner presently finds support for this position in Ky.Rev.Stat. 287.030(4), which provides:

> No person who after July 13, 1984, owns or acquires more than one-half (½) of the capital stock of a bank shall act as insurance agent or broker with respect to any insurance except credit life insurance, credit health insurance, insurance of the interest of a real property mortgagee in mortgaged property, other than title insurance.

In an opinion addressing an earlier version of this statute, the Kentucky Attorney General concluded that a provision prohibiting one person from holding controlling interest in a bank was applicable to national banks doing business in Kentucky. Ky. OAG 70–643. Statutory language similar to the present language prohibiting insurance activities by persons owning more than one-half of the stock of a bank was added in 1972. 1972 Kentucky Acts ch. 174. In 1981, the Kentucky Attorney General issued an opinion, based upon this statute, which concluded that a bank holding company could not acquire 100% of the outstanding stock of an insurance agency. Ky. OAG 81–173. In 1984, the present language was enacted as a part of the Kentucky Bank Holding Company Act. 1984 Kentucky Acts ch. 130.

Since 1984, the Commissioner has taken the position that the present version of the statute, as set forth above, is applicable to national banks, and has used the 1970 Attorney General's Opinion as support for his

position. *See* Letter from Assistant General Counsel Stephen B. Cox to David F. Presser (February 28, 1986) [Record # 16, Tab 7].[3] The Commissioner has also taken the position that 12 U.S.C. § 92 only provides that the sale of insurance by a national bank is not *ultra vires* to the bank's charter, and does not convey a unilateral right to engage in the business of insurance.

Having provided the legal framework for the discussion, the court will now turn to the substantive claims of the parties. A very narrow question is presented: May the Commissioner, consistent with federal law, refuse to permit national banks to apply for insurance licenses?

## IV. THE BANK HOLDING COMPANY ACT

The Commissioner and the associations maintain that the Bank Holding Company Act (BHCA), 12 U.S.C. § 1841 *et seq.*, allows states to regulate bank holding companies and their subsidiaries, including national banks, in the manner prescribed in Ky.Rev.St. 287.030(4). If true, this conclusion would obviate the need to address the questions presented under 12 U.S.C. § 92.[4]

The BHCA was enacted in 1956, to provide federal regulation of bank holding companies and the type of assets appropriate for such companies to control. S.Rep. No. 1095, 84th Cong., 1st Sess. 1 (1955). Unlike national banks, which are primarily regulated by the Comptroller of the Currency, primary regulatory authority for bank holding companies was placed with the Board of Governors of the Federal Reserve System (Federal Reserve Board). 12 U.S.C. § 1842. The BHCA is divided into two principal areas. Section 3, 12 U.S.C. § 1842, governs the authority of the Federal Reserve Board with respect to banking subsidiaries of bank holding companies.

---

**3.** The Commissioner likely took this position prior to 1984, as well, although no documents to that effect have been presented to the court.

**4.** In addressing this argument, this court will assume, without deciding, the continued exis-

tence of 12 U.S.C. § 92. This is consistent with the position of the Commissioner and the associations that the court may decide the BHCA issue without reaching the question of the statute's continued existence.

Section 4, 12 U.S.C. § 1843, governs the acquisition of non-banking subsidiaries.

The Commissioner and the associations argue that Section 7 of the BHCA, 12 U.S.C. § 1846, permits the application of Ky.Rev.St. 287.030(4) to the plaintiff banks.[5] Section 7 provides, "No provision of this chapter shall be construed as preventing any State from exercising such powers and jurisdiction which it now has or may hereafter have with respect to companies, banks, bank holding companies, and subsidiaries thereof." 12 U.S.C. § 1846. The Commissioner and the associations both misread and misinterpret this section.

This section did not grant any additional regulatory powers to the states. It merely preserved the powers extant at the time of enactment and such powers as may exist in the future. It neither enlarged nor diminished state regulatory powers with respect to national banks or bank holding companies. *American Trust Co., Inc. v. South Carolina State Board of Bank Control*, 381 F.Supp. 313, 324 (D.S.C.1974). The legislative history of the BHCA clearly reflects Congressional intent that it have a neutral effect on the dual system of banking regulation. This was the purpose for the inclusion of Section 7. *See Control and Regulation of Bank Holding Companies: Hearings on H.R. 2674 Before the House Comm. on Banking and Currency*, 84th Cong., 1st Sess. 366–67 (1955).

 Since *M'Culloch v. Maryland*, 4 Wheat. 316; 4 L.Ed. 579 (1819), it has been beyond doubt that Congress can establish and regulate a national system of banks. Only where Congress has explicitly provided for state regulation of national banks has such regulation been permitted. Otherwise, a state cannot prevent a national bank from exercising its express powers. *See Franklin Nat. Bank v. New York*, 347 U.S. 373, 378, 74 S.Ct. 550, 553, 98 L.Ed. 767 (1954).

Congress has typically permitted state regulation when it acts to preserve the dual system of banking in the United States, such as in Congressional treatment of branch banking for national banks. *See* 12 U.S.C. § 36; *First Nat. Bank in Plant City Fl. v. Dickinson*, 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969). Congress could have permitted national banks to conduct branching activities regardless of state law. *Cf. Lyons Savings & Loan Ass'n v. Federal Home Loan Bank Board*, 377 F.Supp. 11, 20 (N.D.Ill.1974). However, it chose not to give national banks a competitive advantage over state banks.

In contrast, this case concerns an express power of certain national banks; a power granted by Congress, in the exercise of its unquestioned power to regulate the national banking system. The statute granting the power to sell insurance contains no language permitting states to absolutely prohibit of the exercise of this power by national banks. The only condition placed on the ability of these national banks to sell insurance is the requirement that the involved insurer be licensed to do business in the state by the appropriate state authorities. In short, 12 U.S.C. § 92 grants an express power to national banks which states could not eliminate when the BHCA was enacted, and cannot eliminate now.

Having determined that 12 U.S.C. § 1846 does not grant additional power to directly regulate national banks, the question then becomes whether states can regulate indirectly what they cannot regulate directly. This would be the end result if states were permitted to veto an express power of a national bank by virtue of their ability to regulate bank holding companies. This is an illogical result.

There is absolutely no doubt that Ky. Rev.St. 287.030(4) is a permissible regulation of bank holding companies. However, there is also no doubt that a statute which expressly prohibited all banks operating in Kentucky from selling insurance would be an unconstitutional violation of the Supremacy Clause. U.S. Const., art. VI, cl. 2. Such a statute would directly conflict with

---

5. In addressing this argument, the court again notes that each of the plaintiff banks is a wholly owned subsidiary of a bank holding company.

[Record # 25, 26, 27]. It is not clear whether these holding companies are Kentucky corporations.

federal law, and a national bank would not be subject to such regulation. *National State Bank, Elizabeth, N.J. v. Long*, 630 F.2d 981, 987 (3rd Cir.1980). The authority given to states to regulate bank holding companies does not give them any additional authority to regulate national banks simply because the national bank may happen to be a subsidiary of a bank holding company. Any authority a state has to regulate a national bank derives either from a specific grant of authority under federal law, or from the lack of an inconsistent federal law. It does not derive from the bank's form of ownership.

The Commissioner may regulate bank holding companies and their national bank subsidiaries. However, the BHCA does not permit the Commissioner to prohibit the exercise of an express power granted by Congress, without limitation, to national banks. Refusal to provide the requested applications constitutes such an improper prohibition. This argument is without merit.[6]

## V. THE EXISTENCE OF 12 U.S.C. § 92

■ Relatively late in the briefing of this case, an issue was presented to the court regarding the continued existence of 12 U.S.C. § 92. In *Independent Insurance Agents of America, Inc. v. Clarke*, 955 F.2d 731 (D.C.Cir.1992), the court concluded that Congress inadvertently repealed this section in 1918. One other court has addressed this issue, reaching the opposite result. *See American Land Title Ass'n v. Clarke*, 968 F.2d 150 (2nd Cir. 1992). Not surprisingly, each side in the present case argues strenuously that the

case which supports their position was correctly decided, while the other decision was poorly reasoned. This leaves the court with little choice but to examine the issue anew.

For the sake of brevity, the court will not engage in a lengthy explication of the relevant legislative history. Rather, the court will simply state that it has examined the materials provided by the parties in support of their respective positions. Having reviewed the legislative history and studied the reasoned opinions of both the District of Columbia Circuit Court of Appeals and the Second Circuit Court of Appeals, this court agrees with the rationale of the Second Circuit. Accordingly, that part of the Second Circuit Opinion headed "A. Validity of 12 U.S.C. § 92" is adopted by this court the same as if set forth herein. *Id.*, at 151–54.

This court's examination of the legislative history of § 92 would have led it to the same conclusion quite apart from the Second Circuit's decision. To determine that § 92 has been repealed would be to circumvent logical statutory construction. This court also holds that "section 92 remains valid law." *Id.*, at 154.

## VI. PREEMPTION

■ Having determined that 12 U.S.C. § 92 continues to exist with the full force of law, the court now turns to the question of whether this section preempts Ky.Rev. St. 287.030(4). At the outset, the court again notes that § 92 grants to national banks located in towns with less than 5,000 persons the express power to act as insur-

---

**6.** The authority cited by the Commissioner and the associations in support of this argument is inapposite since the cases either deal with a state's ability to regulate bank holding companies or to exercise regulatory authority over national banks as permitted under federal law. This court takes issue with neither of those state powers. *See Commercial Nat. Bank of Little Rock v. Board of Governors of the Federal Reserve System*, 451 F.2d 86 (8th Cir.1971) (regulation of bank holding companies and branch banking); *Bank of New Orleans & Trust Co. v. Saxon*, 211 F.Supp. 576 (D.D.C.1962), *aff'd* 323 F.2d 290 (D.C.Cir.1963), *rev'd on jurisdictional grounds*, 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d

386 (1965) (regulation of bank holding companies); *Security Nat. Bank & Trust Co. v. First W.Va. Bancorp., Inc.*, 166 W.Va. 775, 277 S.E.2d 613 (1981), *appeal dismissed*, 454 U.S. 1131, 102 S.Ct. 986, 71 L.Ed.2d 284 (1982) (regulation of bank holding companies); *Whitney Nat. Bank in Jefferson Parish v. James*, 189 So.2d 430 (La. App.), *appeal denied*, 249 La. 759, 191 So.2d 140 (1966) (regulation of bank holding companies and branch banking); *Braeburn Securities Corp. v. Smith*, 15 Ill.2d 55, 153 N.E.2d 806 (1958), *appeal dismissed*, 359 U.S. 311, 79 S.Ct. 876, 3 L.Ed.2d 831 (1959) (regulation of bank holding companies).

ance agents. National banks are not subject to attempted state control which would directly conflict with laws of the United States. *Starr v. O'Connor*, 118 F.2d, at 555.[7]

■ In addressing the question of preemption, the Commissioner and the associations are correct that the standard for preemption does not change simply because national banks are involved. Under the Supremacy Clause of the Constitution, Art. VI, cl. 2, any state law which conflicts with federal law is "without effect." *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981). However, "consideration of issues arising under the Supremacy Clause 'start[s] with the assumption that the historic police powers of the States [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purpose of Congress.'" *Cipollone v. Liggett Group, Inc.*, —— U.S. ——, ——, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992), *quoting Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Accordingly, the Congressional purpose for the enactment is the ultimate determining factor in the preemption analysis. *Malone v. White Motor Corp.*, 435 U.S. 497, 504, 98 S.Ct. 1185, 1190, 55 L.Ed.2d 443 (1978).

■ As articulated in *Cipollone*, there are three principal ways for Congress to signal the paramount authority of federal law in a particular area. *Cipollone*, —— U.S., at ——, 112 S.Ct., at 2615–19. First, Congressional intent of supremacy may be expressly stated in the language of the statute or implicitly contained in its structure and purpose. *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). Second, in the absence of express Congressional guidance, state law will be preempted if it actually conflicts with federal law. *Pacific Gas & Elec. Co. v. Energy Resources Conservation and Development Comm'n*, 461 U.S. 190, 204, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983). Finally, contrary state laws

may be preempted if federal law has so thoroughly occupied a field as to allow a reasonable inference that Congress intended no state law to supplant federal authority. *Fidelity Federal Savings & Loan Ass'n. v. De la Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982).

The Commissioner and the associations are correct that there is no express statement of supremacy in § 92, nor has Congress occupied the entire field of national bank regulation. However, § 92 does appear to squarely conflict with Ky.Rev.St. 287.030(4), as it has been interpreted by the Commissioner.

■ The Commissioner and the associations contend that there is no actual conflict between § 92 and the state statute and raise three arguments in support of that position. For an actual conflict to exist, it must be a physical impossibility to comply with both the federal and state statutes. *Hillsborough County, Fla. v. Automated Medical Labs, Inc.*, 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985).

First, the Commissioner and the associations maintain that the two statutes can be easily reconciled. This argument attempts to weaken the express language of § 92, by massaging the Commissioner's 1986 position that § 92 merely provides that this insurance activity is not *ultra vires* to a national bank's charter. *See* Letter from Assistant General Counsel Stephen B. Cox to David F. Presser (February 28, 1986) [Record # 16, Tab 7]. Section 92 itself disposes of this argument. If a national bank meeting the requirements of § 92 wishes to exercise the power granted to it under this statute, it cannot do so under the present interpretation of Kentucky law by the Kentucky Insurance Commissioner.

Indeed, the scant legislative history of § 92 itself reveals that the primary intent of § 92 was not to place national banks on the same footing as state banks in states where state banks were permitted to sell insurance. Rather, the primary intent was

---

**7.** The court takes no position on whether the express language of Ky.Rev.Stat. 287.030(4) permits its application directly to national banks.

It is sufficient for the purpose of this inquiry that the Commissioner has applied it in such a manner.

to strengthen small national banks by providing them with an additional source of revenue. *See* Letter from Comptroller John Skelton Williams to Senator Robert Owen (June 8, 1916) [included at 53 Cong. Rec. 11001]. There is no indication that Congress intended that § 92 would only apply where it was needed to allow national banks to compete with state banks. There is absolutely no authority for the Commissioner's pseudo *ultra vires* argument. It is indeed impossible to reconcile these two provisions.

Second, the Commissioner and the associations contend that Ky.Rev.St. 287.030(4) does not purport to regulate national banks. Instead, they contend that the statute only regulates the licensure of insurance agents within the Commonwealth, based upon their affiliation with bank holding companies. This argument is disingenuous at best, and erroneous at worst. The section is included within a statute addressed to limitations on the powers of banks, and is contained in the chapter of the Kentucky Revised Statutes dedicated to banks and trust companies. It is an attempt to regulate bank holding companies, and, by interpretation, their national bank subsidiaries. It is, at best, an indirect regulation of insurance licenses. As interpreted by the Commissioner, it is in direct conflict with a federal statute and is preempted.

Finally, the Commissioner and the associations argue that Ky.Rev.Stat. 287.030(4) is consistent with the objectives of Congress in enacting § 92. This relies upon a statement in Comptroller Williams' letter which refers to allowing national banks to become more competitive with state banks which are authorized to engage in nonbanking activities. However, this court's reading of the Williams letter indicates that the primary objective was to ensure profitability for smaller national banks which would allow them to both lend money at nonusurious rates and make a better return to their stockholders. Comptroller Williams did not specifically reference the ability of state banks to engage in the business of insurance, but merely pointed out that some state banks were able to carry on nonbanking activities. Recognizing that fact, he could have recommended that language be included which limited the exercise of this power to states where both national and state banks could engage in insurance activities. However, no such limitation was included. Reflecting the desire to provide an additional revenue source to national banks, § 92 was drafted to apply to all national banks meeting its requirements. Ky.Rev.Stat. 287.030(4) is not consistent with Congressional objectives in enacting § 92.

The court has no difficulty concluding that § 92 preempts Ky.Rev.Stat. 287.030(4). To the extent that the Commissioner interprets the Kentucky statute to prohibit national banks in Kentucky from utilizing § 92, that interpretation is in direct conflict with federal law. The Commissioner is attempting to prevent national banks from participating in the sale of insurance simply because they are banks. This is contrary to the Congressional enactment. Congress clearly knew how to defer to state regulatory authority over national banks. It did so in permitting states to determine whether national banks within their borders could engage in branch banking. 12 U.S.C. § 36. There is no such deference contained in § 92. The state statute, as interpreted, must give way in the face of contrary federal law. *Davis v. Elmira Savings Bank,* 161 U.S. 275, 16 S.Ct. 502, 40 L.Ed. 700 (1896). The plaintiff banks may not be prevented from applying for insurance licenses.

## VII. THE McCARRAN–FERGUSON ACT

■ Finally, the Commissioner and the associations argue that Ky.Rev.Stat. 287.030(4) is a valid exercise of state authority under the McCarran–Ferguson Act. 15 U.S.C. §§ 1011–1015. This act was passed in response to the Supreme Court's decision in *United States v. South–Eastern Underwriters Ass'n,* 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), which held that insurance companies were subject both to regulation by Congress and to federal anti-trust laws.

At issue in this case is 15 U.S.C. § 1012(b) which provides:

> (b) Federal regulation. No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the Purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance.

It is perhaps simpler to address this statute in reverse order and first examine whether 12 U.S.C. § 92 is an Act of Congress which relates to the business of insurance.

The "business of insurance" has been narrowly defined, and it seems fairly obvious that § 92 does not constitute Congressional regulation of that business. This section is a part of the National Bank Act, and its function is to grant additional powers to national banks. That the power granted to the national banks involves insurance does not transform this section into a regulation of the business of insurance. Accordingly, § 92 will not invalidate the Kentucky statute on these grounds.

Moreover, the other portion of 15 U.S.C. 1012(b) is equally inapplicable to this case. Just as § 92 does not regulate the business of insurance, neither does Ky.Rev.Stat. 287.030(4) constitute insurance regulation. As previously mentioned, this statute regulates bank holding companies, and is contained in chapter of the Kentucky Revised Statutes regulating banks and trust companies. It does not appear in the portion of the Kentucky Revised Statutes which regulates insurance. It relates to the powers of bank holding companies, not to the powers of insurance companies or agents.

To determine whether a state law or regulation governs the "business of insurance", the Supreme Court has articulated a three-part test. The court must consider:

> [F]irst, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the

practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry.

*Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 129, 102 S.Ct. 3002, 3009, 73 L.Ed.2d 647 (1982). Applying these criteria to the present case, the court reaches the inescapable conclusion that Ky.Rev.St. 287.030(4) does not regulate the business of insurance. The Kentucky statute is not concerned with transferring or spreading the risk of any policyholders, nor does bank holding company ownership of insurance entities constitute an integral part of the policy relationship between the insurer and the insured. Finally, bank holding companies are not entities within the insurance industry. The McCarran–Ferguson Act has no applicability to the issue now before the court. *See United Services Auto Ass'n v. Muir,* 792 F.2d 356 (3rd Cir.1986), *cert. denied,* 479 U.S. 1031, 107 S.Ct. 875, 93 L.Ed.2d 830 (1987).

## VIII. CONCLUSION

Based upon the foregoing analysis, the court believes that the Commissioner is required to provide the plaintiff banks, and other similarly situated national banks, with applications for insurance licenses. The Commissioner's interpretation of law reflected in this litigation is incorrect.[8]

This memorandum opinion and order contains the court's rulings on all pending motions except the motions for summary judgment which will be addressed by separate order. The court having considered the record and being otherwise sufficiently advised,

Accordingly,

IT IS HEREBY ORDERED:

(1) that the Commissioner's motion to dismiss, [Record # 4], be, and is DENIED,

---

**8.** The court specifically declines to determine whether the Commissioner is required to issue licenses once the completed applications are received. Whether national banks are subject to Kentucky's criteria for the issuance of an insurance license is not properly before the court, and may well implicate McCarran–Ferguson in other respects. In any event, the court need not reach this issue in narrowly deciding that Ky.Rev.Stat. 287.030(4), as interpreted, is preempted by 12 U.S.C. § 92, and does not permit the Commissioner to refuse to provide the requested applications.

in conformity with the reasons stated herein;

(2) that the associations' motion to dismiss, [Record # 7], be, and is DENIED, in conformity with the reasons stated herein; and

(3) that the plaintiffs' motion for leave to file a memorandum of supplemental authorities, [Record # 43], be, and is GRANTED.

SUMMARY JUDGMENT

In accordance with the memorandum opinion and order entered contemporaneously with this summary judgment,

IT IS HEREBY ORDERED:

(1) that the motion of the plaintiffs for summary judgment, [Record # 14], be, and is GRANTED, and summary judgment is ENTERED on behalf of the plaintiffs on their complaint;

(2) that the joint motion of the defendant and the intervening defendants for summary judgment, [Record # 28], be, and is DENIED;

(3) that the motion of the intervening plaintiff for summary judgment, [Record # 60], be, and is GRANTED, and summary judgment is ENTERED on behalf of the intervening plaintiff on its intervening complaint;

(4) that, notwithstanding the provisions of Ky.Rev.Stat. 287.030(4), any national bank in Kentucky that is located and doing business in a town with a population that does not exceed 5,000 inhabitants, according to the last decennial census, has the right and authority, by virtue of 12 U.S.C. § 92, and Article VI, Cl. 2 of the United States Constitution, to engage in the business of insurance, in accordance with applicable law;

(5) that the defendant, Ronnie C. Moore, in his official capacity as Commissioner of the Kentucky Department of Insurance, and his successors, agents, employees, representatives or others acting in concert with him, be, and are permanently enjoined from refusing to provide an application to become an insurance agent to any national bank located and doing business in a town in Kentucky with a population that does not exceed 5,000 inhabitants, according to the last decennial census; and,

(6) that this matter be, and is STRICKEN from the docket of this court.